UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| VERMONT RAILWAY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 2:16-cv-16 |
| v. | : | |
| | : | |
| TOWN OF SHELBURNE, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## Opinion and Order

This consolidated action arises out of Plaintiff Vermont
Railway's ("Railway") planned development of property located at
2087 Shelburne Road in Shelburne, Vermont.  In its Complaint,
the Railway requests a declaratory judgment that the Interstate
Commerce Commission Termination Act ("ICCTA") preempts Defendant
Town of Shelburne's ("Town") zoning regulations as applied to
the Railway's planned development.  The Railway also seeks
injunctive relief enjoining the Town from enforcing such
regulations.

The Town has filed several counterclaims against the
Railway.  In its first two counts, the Town requests declaratory
judgments that the ICCTA's preemption clause does not cover the
Railway's planned development, and that the development must
comport with all zoning regulations derived from the Town's

police powers.  The Town also brings counts of public nuisance, unlawful interference with easement rights, and breach of lease.

Currently before the Court are the Town's motion for preliminary injunction (ECF Nos. 8 & 13) and the Railway's motion for judgment on the pleadings with respect to Counts III-V of the Town's counterclaims (ECF No. 36).  In addition, following a six-day evidentiary hearing on the Town's motion for preliminary injunction, both parties filed post-hearing memoranda requesting rulings on the declaratory relief sought in Count I of the Railway's Complaint and Counts I and II of the Town's counterclaims (*See* ECF Nos. 76 & 77).  At the parties' request, the Court will rule on those counts as well.

For the reasons set forth below, the Court **denies** the Town's motion for preliminary injunction and **grants** the Railway's motion for judgment on the pleadings with respect to Counts III-V of the Town's counterclaims.  Moreover, the Court enters a **declaratory order** that the ICCTA preempts the Town's pre-construction permit requirement, and **enjoins** the Town from enforcing any regulation that prevents the Railway from constructing its proposed facility.  The Court therefore **grants in part** the Railway's request for a declaratory judgment that the ICCTA preempts the Town's zoning regulations as applied to the Railway's planned development (Count I of the Railway's Complaint); **denies** the Town's request for a declaratory judgment

2

that the ICCTA's preemption clause does not cover the Railway's planned development (Count I of the Town's counterclaims); and **denies in part** the Town's request for declaratory relief providing that the Railway's project must comport with all zoning regulations arising from the Town's police powers (Count II of the Town's counterclaims).

The Court reserves judgment on the question of whether the ICCTA preempts other zoning regulations derived from the Town's police powers that relate to the operation of the Railway's proposed facility. When the Railway has finalized its plans for development, and when the Town has indicated precisely which zoning regulations it intends to enforce, the Court will determine whether those regulations can survive ICCTA preemption pursuant to the police power exception outlined below.

**BACKGROUND**

Vermont Railway operates 128 miles of rail line between Hoosick Falls, New York and Burlington, Vermont. As part of its business, the Railway transports road salt into Vermont for use during the winter months. Until recently, the Railway shipped the salt to its facility on Flynn Avenue in Burlington. Barrett Trucking Co., Inc. ("Barrett Trucking"), which owns an adjacent property on Austin Drive, contracts with the Railway to distribute the salt to many Vermont towns and other private entities.

In the summer of 2015, a real estate broker contacted both the Railway and Barrett Trucking with a request to purchase each company's property on or near Flynn Avenue.  The Railway had contemplated a sale prior to communicating with the broker, as its Burlington facility had become outdated, inefficient, and too small to accommodate the increased need for road salt.  Both companies subsequently entered into contracts to sell their properties.  As a result, the Railway's salt facility required relocation by late 2016.

Around the time that they agreed to sell their respective properties, David Wulfson, president of the Railway, and Joseph Barrett, president of Barrett Trucking, began to speak with each other about a plan to move the Railway's salt facility.  Through those discussions, David Wolfson introduced Joseph Barrett to his brother Todd Wolfson.  Todd Wolfson, as a shareholder of Northern Vermont Financial Corporation ("NVFC"), offered to sell Barrett Trucking a 34-acre tract of land located at 2087 Shelburne Road in Shelburne, Vermont ("Property").  Barrett Trucking accepted the offer, signed a purchase and sale agreement, and paid NVFC a non-refundable down payment of $300,000.

According to the testimony of both David Wolfson and Joseph Barrett, Barrett Trucking initially planned to lease the majority of the Property to the Railway for the relocation of

its salt facility.  Barrett Trucking, under that initial plan, was to retain only a small portion of the land for its own operations.  With that idea in mind, Barrett Trucking hired the environmental engineering firm of Vanasse Hangen Brustlin, Inc. ("VHB") to provide a number of services related to the planning and development of the Property.  The Railway met with the Town in June 2015 to discuss the early site plans produced by VHB.

Sometime after signing the purchase and sale agreement and retaining the services of VHB, Barrett Trucking learned that it would not be able to obtain financing for the Property in a timely fashion.  Consequently, Barrett Trucking assigned its rights under the purchase and sale agreement to the Railway, and on December 28, 2015, the Railway purchased the Property from NVFC.[1]  The Railway updated the Town on its plans for development the following day.[2]  Two days later, on December 31, 2015, the Railway began pre-construction tree and vegetative clearing on the Property.

---

[1] At the time of the purchase, the Railway gave Barrett Trucking a $300,000 promissory note, which represented the amount that Barrett Trucking had paid for the down payment.  Barrett Trucking also lent the Railway an additional $75,000 for the purchase of the Property.  David Wolfson and Joseph Barrett testified that loans of that nature are commonplace between the two companies.

[2] In addition, on December 23, 2015, VHB provided the Town with a copy of the Notice of Intent form that it had submitted to the Vermont Department of Environmental Conservation ("DEC") as part of its application for a NPDES Discharge Permit GP 3-9020 for Stormwater Runoff from Construction Sites ("Construction General Permit").  The Notice of Intent form identified the planned earth disturbance activities on the Property.  DEC later issued the Construction General Permit on February 24, 2016.

On January 20, 2016, the Town issued a Notice of Violation
with respect to the Railway's development of the Property.  The
Notice asserted that the Railway had violated the Town's Zoning
Bylaws by commencing land development without a zoning permit.
It further advised that if the Railway did not remedy the
violation within seven days, the Town could pursue legal
remedies.

Less than a week later, on January 25, 2016, the Town filed
a complaint against the Railway in the Environmental Division of
the Vermont Superior Court.  The Town filed a motion for
preliminary injunction on the same day.  In its initial
complaint, the Town requested declaratory judgments that the
ICCTA's preemption clause does not cover the Railway's project,
and that the Railway's planned development must comport with all
regulations derived from the Town's police powers.  The Town
also included claims of public nuisance and unlawful
interference with easement rights.  On January 26, 2016, the
Town filed a motion for leave to amend its complaint.  It served
the Railway with the summons, complaint, amended complaint,
motion to amend, and motion for preliminary injunction on the
following day.

Also on January 26, 2016, the Railway filed the instant
action in federal court.  As stated above, the Railway's
Complaint seeks a declaratory judgment that the ICCTA preempts

the Town's zoning regulations as applied to the Railway's planned development.  It also requests injunctive relief enjoining the Town from enforcing those regulations.  On January 27, 2016, the Railway removed the Town's state action to this Court.

The Town filed and served its Answer to the Railway's Complaint on February 16, 2016.  In its Answer, the Town asserts as counterclaims the same counts that it brought in its state court complaint.  It also includes a count for breach of lease. Upon request from the parties, the Court consolidated the removed case and the present action on February 24, 2016.

On March 7, 2016, both parties appeared at an initial hearing regarding the Town's motion for preliminary injunction. At that time, the Court ordered the parties to engage in expedited discovery and scheduled a full evidentiary hearing on the matter.  The evidentiary hearing occurred over six days between May 3, 2016 and May 20, 2016.

During the hearing, the Court heard evidence on several broad topics, including the impact that the Railway's project will have on the environment; the impact that the project will have on traffic; the relationship between the Railway and Barrett Trucking; and the planning and development of the project as conducted by VHB.  The Court also heard evidence regarding the evolving nature of the Railway's plans for

7

development.  According to the Railway, the current site plans
provide for a rail spur, two salt sheds sufficient to
accommodate 80,000 tons of salt, a truck scale, a small office
for the truck scale, and a storm water pond and associated
infrastructure.  Barrett Trucking, which will operate the salt
facility pursuant to a contract with the Railway, will not have
any of its own buildings on site.  In its post-hearing
memorandum, the Railway indicates that "the significant elements
of the proposed intermodal facility . . . are well-settled."
ECF No. 76 at 15.  The Railway acknowledges, however, that the
project's details "may not be finalized."  *Id.*

## DISCUSSION

I.  **The Town's Motion for Preliminary Injunction**

The Court begins by addressing the Town's motion for
preliminary injunction.  It is well established that "[a] party
seeking a preliminary injunction ordinarily must show: (1) a
likelihood of irreparable harm in the absence of the injunction;
and (2) either a likelihood of success on the merits or
sufficiently serious questions going to the merits to make them
a fair ground for litigation, with a balance of hardships
tipping decidedly in the movant's favor."  *Doniger v. Niehoff*,
527 F.3d 41, 47 (2d Cir. 2008) (internal citation omitted).  A
district court has "wide discretion" in determining whether to
grant such relief.  *Grand River Enter. Six Nations, Ltd. v.*

*Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (hereinafter "*Grand River Enter.*").

**A. Irreparable Harm**

With respect to the question of irreparable harm, the Town argues that it is likely to suffer four types of irreversible damage in the absence of an injunction.  First, it asserts that the Railway has already cleared land within the natural wetland buffer zones, and that the failure to replant those buffers will have an adverse impact on the Property's wetlands.  Second, it submits that the Railway has also cleared land within the LaPlatte River corridor, and that continued development within the corridor will accelerate erosion and negatively affect the natural course of the river's migration.  Third, the Town maintains that the clearing performed by the Railway destroyed part of an old growth forest, which served as a portion of a deer wintering habitat.  The Town contends that it will be more difficult to restore both the forest and the deer yard if the Railway's project is allowed to proceed.  Fourth, the Town avers that the continued development of the Property poses a risk to the stonecat fish and the pocketbook mussel, two aquatic species listed as endangered by the State of Vermont.  The Railway disputes each of the Town's assertions.

As indicated by the Second Circuit, irreparable harm is "the single most important prerequisite for the issuance of a

preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation omitted).  In order to establish such harm, the moving party must show that absent a preliminary injunction, it "will suffer an injury that is neither remote nor speculative, but actual and imminent." *Grand River Enter.*, 481 F.3d at 66.  The injury must be one that "cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

Here, the Town has not shown that it will suffer such actual and imminent harm if the Court denies its request for injunctive relief.  To begin, the Town contends that the failure to replant natural wetland buffer zones will irreparably harm the wetlands on site.  The Town supports its position with the testimony of environmental experts Michael Lew-Smith and Dolores Barton.  As explained by Mr. Lew-Smith, a wetland buffer is not a part of a jurisdictional wetland.  ECF No. 61 at 154.  Rather, as its name suggests, a wetland buffer falls outside of a wetland and serves to "preserve the [wetland's] functions and values." *Id.*  With respect to the wetlands at issue, Mr. Lew-Smith opined that the failure to replant the natural wetland buffer zones will impact two of the wetlands' functions and values--namely, their water quality and their ability to provide a habitat for wildlife.  ECF No. 61 at 155-56.  Ms. Barton agreed with Mr. Lew-Smith's assessment of the buffer zone's

10

impact on wetland water quality.  *See* ECF No. 64 at 719 ("[A]t
this point in time this gravel swale is discharging directly
into--within feet of the LaPlatte wetland . . . and I expressed
concern about that . . . .").

Additional evidence presented at the hearing contradicts
the opinions of Mr. Lew-Smith and Ms. Barton.  Regarding the
buffer's impact on wetland water quality, Ms. Barton
acknowledged that buffer zones are not the only means of
protecting the water inside a wetland.  *See* ECF No. 61 at 112.
VHB's Jeffrey Nelson elaborated on that notion, indicating that
prior to the start of construction, VHB prepared an Erosion
Prevention Sediment Control ("EPSC") plan designed "to protect
water quality as the project is being built."  ECF No. 70 at
993.  Mr. Nelson further explained that, as per the EPSC plan,
VHB installed a reinforced silt fence in all areas where the
buffer zones had been cleared on the Property.  ECF No. 70 at
993-94.  Because the reinforced fence provides a high level of
protection to any receiving waters, ECF No. 70 at 994,
essentially serving the buffer zone's water quality preservation
function, there is no reason to believe that wetland water
quality is likely to suffer actual, irreparable harm if
development proceeds without natural wetland buffers.
Additionally, with respect to the buffer's function as a
wildlife habitat, the parties do not dispute that the wetland

buffer zones have already been cleared.  In light of that
uncontested fact, and irrespective of any damage to the wildlife
habitat that has already occurred, it is simply too speculative
to claim that any further development will irreversibly damage
the possibility of future regrowth.  For both of those reasons,
the Town has failed to establish a likelihood of actual and
imminent irreparable harm to the Property's wetlands in the
absence of a preliminary injunction.[3]

Next, as to the Town's assertion regarding irreparable harm
to the river corridor, the Town's environmental expert was
unable to identify any particular form of damage that is likely
to occur in the event that the Railway's development encroaches
on the corridor.  *See* ECF No. 61 at 78 (stating that
"development within the river corridor is not a good idea and
that it can it can lead to conflicts between protection of human
infrastructure and allowing the natural processes to occur
within the river channel.").  More importantly, in response to
the Town's expressed concerns regarding the corridor, Railway
president David Wulfson testified that he "asked Jeff Nelson to
see if we can adjust [the Railway's] plan to minimize the

---

[3] The parties dispute the significance of the Army Corps of Engineers'
determination that it lacks jurisdiction over the Railway's project.
According to the Railway, the Corps' determination suggests that the Corps
made a finding that the Railway's project will not affect the site's
wetlands.  According to the Town, however, the Corps' determination suggests
only that the Railway's project will not involve adding "fill" to the
wetlands.  Because the evidence does not clearly define the scope of the
Corps' jurisdiction, the Court does not rely on the Corps' determination in
making its finding regarding the project's impact on the site's wetlands.

impacts on the river corridor." ECF No. 68 at 863. Mr. Nelson
and VHB complied with Mr. Wulfson's request, and the Railway's
counsel has represented that "even the infrastructure associated
with stormwater control (the only aspects of the project that
were previously contemplated within the river corridor) have
[sic] been re-located and will be outside of the river
corridor." ECF No. 76 at 34-35. As a result, the Town has not
shown that the Railway's continued development of the Property
is likely to irreparably harm the LaPlatte River corridor.

     With respect to the Town's claim regarding the destruction
of the forest and the deer yard, both parties agree that the
tree clearing work on the Property is now complete. Because the
project site has already been cleared, and because the Railway
does not intend to clear any additional land, there cannot be a
risk of irreparable harm to the remaining forest on the Property
at this time. Moreover, as explained above, the Town's argument
that the continued development of the Property will irreversibly
damage the potential for future regrowth is too speculative to
satisfy the element at bar. The same rationale applies to the
Town's claim regarding the destruction of the deer yard. In
addition, the Town's environmental expert testified that white
tail deer are not listed as endangered by the State of Vermont,
ECF No. 61 at 126, and that the deer yard on the Railway's
project site is only one portion of a 285-acre deer wintering

habitat, ECF No. 61 at 130.  For all of those reasons, the Town has failed to establish that further development of the Railway's Property is likely to result in irreparable harm the site's forest or the deer wintering habitat.

Finally, as to the Town's concerns relating to the stonecat fish and the pocketbook mussel, the Town's environmental expert Mr. Lew-Smith testified that no plant or animal species listed as rare, threatened, or endangered by the State of Vermont has been identified within the project's disturbance area.  ECF No. 62 at 199.  Furthermore, Padraic Monks of the Vermont Department of Environmental Conservation testified that in reviewing the Railway's application for a Construction General Permit, his department considered how the project would impact wildlife, and "relied on [the Vermont Department of Fish and Wildlife's] final statement which said that the project would not result in adverse impact to state or federally listed threatened or endangered species."  ECF No. 63 at 434.  Given that testimony, as well as the lack of evidence that the project has adversely impacted any listed species, the risk presented to the stonecat fish and the pocketbook mussel is far too speculative to establish a likelihood of actual irreparable harm.

Thus, because the Town has not demonstrated that it is likely to suffer actual and imminent irreparable harm in the

absence of a preliminary injunction, its request for injunctive relief cannot succeed.

## B. Success on the Merits

With regard to the question of success on the merits, the parties' competing claims for declaratory relief hinge on a determination of whether the ICCTA preempts the Town's zoning regulations as applied to the Railway's development of the Property.  To date, the only zoning regulation that the Town has attempted to enforce is its pre-construction permit requirement. In its post-hearing memorandum, however, the Town identifies several other broad categories of regulation stemming from its police powers that it seeks to impose on the Railway.  The Town further submits that it will not be able to properly exercise its police powers until the Railway produces a final site plan. Because the Railway has yet to finalize its plans for development, and because the Town has not identified with precision how it intends to utilize its police powers, the Court reserves judgment on the question of whether the ICCTA preempts the broad categories of regulation suggested by the Town. Nonetheless, the case law is clear that the ICCTA preempts the Town's pre-construction permit requirement.  The Town has therefore failed to show that it can prevent the Railway from constructing its proposed facility.  For that added reason, the Town's motion for preliminary injunction cannot succeed.

15

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Accordingly, "[u]nder the doctrine of preemption, a corollary to the Supremacy Clause, any state or municipal law that is inconsistent with federal law is without effect." *Greater New York Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 104-05 (2d Cir. 1999) (abrogated on other grounds). "Federal law may preempt state and municipal law expressly or impliedly," *id.* at 105, and express preemption occurs "when a federal statute expressly directs that state law be ousted," *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009) (internal quotation omitted). In the present case, the statute at issue is the ICCTA.

The Interstate Commerce Commission ("ICC"), created by an act of Congress in 1887, exercised broad regulatory authority over rail transportation for over one hundred years. *Id.* at 102. In 1996, however, the ICCTA abolished the ICC and replaced it with the Surface Transportation Board ("STB"). *Id.* The STB, which continues to perform many of the functions formerly carried out by the ICC, "is vested with broad jurisdiction over 'transportation by rail carriers.'" *Id.* (quoting 49 U.S.C. § 10501(b)(1)). Indeed, pursuant to the ICCTA, the STB has

16

exclusive jurisdiction over "(1) transportation by rail

carriers . . . and (2) the construction, acquisition, operation,

or discontinuance of . . . tracks, or facilities."  49 U.S.C.

§ 10501(b).  The ICCTA defines "transportation" to include:

> (A)  a locomotive, car, vehicle, vessel, warehouse,
> wharf, pier, dock, yard, property, facility,
> instrumentality, or equipment of any kind related to
> the movement of passengers or property, or both, by
> rail, regardless of ownership or an agreement
> concerning use; and
> (B)  services related to that movement, including
> receipt, delivery, elevation, transfer in transit,
> refrigeration, icing, ventilation, storage, handling,
> and interchange of passengers and property.

49 U.S.C. § 10102(9).  It defines "rail carrier," in relevant

part, as "a person providing common carrier railroad

transportation for compensation."  49 U.S.C. § 10102(5).

In addition to the above-cited jurisdiction provision, the

ICCTA contains an express preemption clause.  Specifically, the

statute indicates that "the remedies provided under this part

with respect to regulation of rail transportation are exclusive

and preempt the remedies provided under Federal or State law."

49 U.S.C. § 10501(b).  Interpreting that clause, the Second

Circuit has held that the "ICCTA preempts all state laws that

may reasonably be said to have the effect of managing or

governing rail transportation, while permitting the continued

application of laws having a more remote or incidental effect on

17

rail transportation." *Island Park, LLC*, 559 F.3d at 102 (internal quotations omitted).

Ultimately, in determining whether the ICCTA preempts the Town's zoning regulations as applied to the Railway's planned development, the Court must consider two questions. *See id.; see also N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238 (3d Cir. 2007) (hereinafter "*N.Y. Susquehanna*"). First, the Court must assess whether the Railway's project is "transportation by [a] rail carrier[]," and thus subject to the ICCTA's preemption clause. *See N.Y. Susquehanna*, 500 F.3d at 247. Second, the Court must decide whether the Town's zoning regulations fall within the scope of ICCTA preemption. *See id.* at 252. The Court will address each of those questions in turn.

## 1. Whether the ICCTA's Preemption Clause Covers the Railway's Project

The question of whether the Railway's project constitutes "transportation by [a] rail carrier[]" involves two distinct inquiries: (1) whether the Railway's project involves "transportation" activities; and (2) whether, in carrying out those activities, the Railway acts as a "rail carrier."

### a. Whether the Railway's Activities Are "Transportation"

With regard to the first inquiry, it appears to be undisputed that the construction and operation of the Railway's salt facility constitute "transportation" within the meaning of

the ICCTA.  The Railway has indicated that the planned facility
will be used primarily "for unloading bulk salt arriving by rail
for local distribution by truck and for temporary storage in
sheds pending distribution."  ECF No. 11-1 at 2.  Although the
project's initial conception included an office building for
Barrett Trucking, Railway president David Wulfson testified
during the evidentiary hearing that the site plans no longer
call for anything other than intermodal rail services.  ECF No.
68 at 926.  Indeed, the current site plans corroborate Mr.
Wolfson's testimony, providing for a rail spur, two salt sheds
sufficient to accommodate 80,000 tons of salt, a truck scale, a
small office for the truck scale, and a storm water pond and
associated infrastructure.[4]  *See* Plaintiff's Exhibit 69.

A plethora of case law plainly dictates that intermodal, or
transloading, facilities fall within the ICCTA's definition of
"transportation."  *Green Mountain R.R. Corp. v. Vt.*, 404 F.3d
638, 642 (2d Cir. 2005) (hereinafter "*Green Mountain*")
("Certainly, the plain language [of the ICCTA] grants the [STB]
wide authority over the transloading and storage facilities
undertaken by Green Mountain."); *Tex. Cent. Bus. Lines Corp. v.
City of Midlothian*, 669 F.3d 525, 530 (5th Cir. 2012)
(determining that "transloading qualifies as rail

---

[4] As noted above, although the Railway has conceded that the details of its
plans are not yet finalized, its counsel has represented that "the
significant elements of the proposed intermodal facility . . . are well-
settled."  ECF No. 76 at 15.

transportation"); *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010) (holding that "ethanol transloading falls within the ICCTA's preemptive scope"); *N.Y. Susquehanna,* 500 F.3d at 248 ("[W]e hold that transloading operations are 'transportation' under the [ICCTA]."). Accordingly, there can be no doubt that the Railway's planned facility constitutes "transportation" under the ICCTA.

### b. Whether the Operation of the Proposed Intermodal Facility Will Be Undertaken by a "Rail Carrier"

As to the second inquiry, the Town asserts that the Railway will not qualify as a "rail carrier" when operating its proposed intermodal facility because it will not act as a "common carrier" as required by the ICCTA. *See* 49 U.S.C. § 10102(5). The ICCTA does not define the term "common carrier," but courts have held that "the distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant." *N.Y. Susquehanna*, 500 F.3d at 250 (internal quotation omitted).  A private carrier, by contrast, "offers services to limited customers under limited circumstances and assumes no obligation to serve the public at large." *Id.* at 251.  The Town submits that because the Railway "only plans to bring in one product (salt), from one company (Cargill) to be transloaded, stored and distributed almost exclusively by one

20

company (Barrett Trucking)," it will not satisfy the definition of "common carrier."  ECF No. 77 at 32.

The Town's argument does not accurately reflect the evidence presented at the hearing.  To begin, Mr. Wulfson testified that the Railway publicly advertises its charges for intermodal operations.  *See* ECF No. 68 at 893.  The publication of such tariffs indicates that the Railway holds itself out to the public as available to ship commodities.  *See N.Y. Susquehanna*, 500 F.3d at 251.  In addition, Mr. Wulfson stated that although the Railway will use the intermodal facility primarily for the transportation of salt, it will also use the facility to occasionally transport other goods, such as lumber. ECF No. 68 at 926.  Mr. Wulfson further indicated that the Railway is contemplating the use of the facility for the transportation of windmill blades.  *Id.*  Based on that testimony, as well as the lack of evidence that the Railway has refused to provide transportation services to other potential customers, the Court is satisfied that the Railway will act as a common carrier as required by the ICCTA.  *See N.Y. Susquehanna*, 500 F.3d at 251.

In addition to its common carrier argument, the Town presents a brief contention that the planned transloading activities will not be performed by a "rail carrier" because Barrett Trucking will operate the intermodal facility.  More

specifically, the Town asserts that it is unclear whether the proposed development "is anything more than a Barrett Trucking project aspiring to be a diversified transload facility, developed in such a way as to fall under the protections of the ICCTA." ECF No. 77 at 33.

Once again, the record evidence belies the Town's assertion. As explained by Mr. Wulfson, the Railway owns the Property and is paying for the construction of the intermodal facility. ECF No. 68 at 905. The Railway is also responsible for paying the taxes and utilities on the planned development. Defendant's Exhibit DD at 6. Although the Railway intends to contract with Barrett Trucking for the operation of the facility, the draft Operating Agreement makes clear that shippers will pay the Railway directly for the movement of freight. Defendant's Exhibit DD at 4. The draft Agreement further provides that the Railway will compensate Barrett Trucking for operating the facility as its exclusive agent, and that Barrett Trucking itself will have no authority to separately transact with third parties for the shipment, storage, or transloading of goods at the facility. *Id.* Given those facts, the Court finds that the Railway will exert sufficient control over the intermodal facility such that the operation of the facility will qualify as transportation

performed by a "rail carrier."[5]  *See Hi Tech Trans, LLC*, STB
Finance Docket No. 34192 (Sub-No. 1), 2003 WL 21952136, at *4-5
(S.T.B. Aug. 14, 2003).

### c. Whether the Railway Waived its Right to Assert Preemption Against the Town

Finally, the Town asserts that even if the Railway's
project constitutes "transportation by [a] rail carrier[]," the
Railway has nonetheless waived its right to claim preemption
under the ICCTA by (1) purchasing the Property with knowledge
that it was once subject to two State of Vermont Act 250
permits; and (2) signing a lease with the State of Vermont for
the use of rail lines that requires the Railway to "maintain and
operate said line or lines of railroad in compliance with
Federal, State and Local laws."  ECF No. 6-1 at 5.

Neither of the Town's waiver arguments can prevail.  First,
with regard to the Act 250 permits, the Town provides no support
for its assertion that the prior issuance of a state land use
permit causes a rail carrier to waive its claim to preemption
under the ICCTA.  To the contrary, this Court previously ruled
that the ICCTA preempted state regulations in a case in which
the Railroad asserting preemption had obtained multiple Act 250
permits on the property in question several years earlier.  *See*

---

[5] In addition, Joseph Barrett has testified that if Barrett Trucking
constructs a building on the Property or exercises its option to purchase the
Property in the future, it will freely submit to the Town's zoning
regulations.  *See* ECF No. 63 at 611-12.

*Green Mountain R.R. Corp. v. Vt.*, No. Civ. 1:01-CV-00181, 2003
WL 24051562 (D. Vt. Dec. 15, 2003), aff'd, 404 F.3d 638 (2d Cir.
2005).   Accordingly, the fact that the Property in this case was
once subject to two Act 250 permits is wholly immaterial to the
question of whether the ICCTA's preemption clause covers the
Railway's project.

Second, as to the lease between the Railway and the State
of Vermont, the Town is correct to assert that "voluntary
agreements between private parties . . . are not presumptively
regulatory," and that consequently, most private contracts do
not "constitute the sort of 'regulation' expressly preempted by
the [ICCTA]."  *See PCS Phosphate Co. v. Norfolk S. Corp.*, 559
F.3d 212, 218 (4th Cir. 2009).   Even assuming that the ICCTA
does not preempt the Railway's lease agreement, however, there
is no reason to believe that the Railway's contract with the
State of Vermont waives the Railway's claim of preemption
against the Town of Shelburne.   Vermont law is clear that
strangers to a contract have no rights thereunder unless they
are intended third-party beneficiaries.  *Bischoff v. Bletz*, 949
A.2d 420, 425-26 (Vt. 2008).   "The determination of whether a
party may be classified as a third-party beneficiary, as opposed
to an incidental beneficiary, is based on the original
contracting parties' intention."  *McMurphy v. State*, 757 A.2d
1043, 1049 (Vt. 2000).   Here, the general contract provision

24

requiring "compliance with Federal, State and Local laws" in no way demonstrates an intent on behalf of the parties to confer a benefit on the Town of Shelburne.  *See* Restatement (Second) of Contracts § 313, Comment a ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.").  Thus, by signing the lease agreement with the State of Vermont, the Railway did not waive its right to assert preemption against the Town of Shelburne.

In sum, for the reasons explained above, the construction and operation of the Railway's planned intermodal facility constitute "transportation by [a] rail carrier[]" as defined by the ICCTA.  Additionally, the Railway did not waive its right to assert ICCTA preemption against the Town by purchasing a property that was once subject to two Act 250 permits or by signing a lease agreement with the State of Vermont.  For both of those reasons, the Court finds that the ICCTA's preemption clause covers the Railway's planned development.

**2. Whether the Town's Zoning Regulations Fall Within the Scope of ICCTA Preemption**

Having determined that the ICCTA's preemption clause covers the Railway's planned intermodal facility, the Court next addresses whether the ICCTA preempts the Town's attempt to regulate the construction and operation of that facility.

As noted above, the plain language of the ICCTA grants the
STB broad authority to regulate the railway industry.
Nonetheless, it is well established that "not all state and
local regulations are preempted [by the ICCTA]; local bodies
retain certain police powers which protect public health and
safety." *Green Mountain*, 404 F.3d at 643.  In order for a state
or local regulation to escape ICCTA preemption under the police
power exception, the regulation "must not (1) discriminate
against rail carriers or (2) unreasonably burden rail carriage."
*Norfolk S. Ry. Co.*, 608 F.3d at 160 (citing *N.Y. Susquehanna*,
500 F.3d at 254 (citing *Green Mountain*, 404 F.3d at 643)).  The
Second Circuit has further explained that state and local
regulations are not preempted "at least to the extent that the
regulations protect public health and safety, are settled and
defined, can be obeyed with reasonable certainty, entail no
extended or open-ended delays, and can be approved (or rejected)
without the exercise of discretion on subjective questions."
*Green Mountain*, 404 F.3d at 643.

Although it is clear that discriminatory or unreasonably
burdensome regulations are subject to preemption under the
ICCTA, it is equally clear that not all municipal regulations
fall into one of those categories.  *See In re Vt. Ry.*, 769 A.2d
648, 655 (Vt. 2000) (holding that the ICCTA did not preempt
several regulations related to traffic issues and environmental

contamination at an intermodal facility on the grounds that
"these conditions do not interfere with *railway*
operations . . .")·  Accordingly, in ruling on whether the ICCTA
preempts the regulation of railroad activity, a court must make
a preemption determination for each individual regulation at
issue.  *N.Y. Susquehanna*, 500 F.3d at 256.

        In the present case, there is no doubt that the Town's pre-
construction permit requirement unreasonably burdens rail
carriage and is therefore preempted by the ICCTA.  According to
the testimony of the Town's Director of Planning and Zoning, the
Town wishes to compel the Railway to submit an application for
its proposed project to the Town's Development Review Board.
ECF No. 62 at 301.  If the Railway were to do so, the Board
would review the application against the Town's zoning and
subdivision regulations, and issue "an approval or denial or
approval with conditions."  ECF No. 62 at 302.  The Town would
then require the Railway to submit a second "application for a
specific permit that would allow construction."  ECF No. 62 at
302.  Numerous courts, including the Second Circuit, have held
that requiring a rail carrier to obtain such a pre-construction
permit imposes an unreasonable burden on rail transportation.
*See, e.g.*, *Green Mountain*, 404 F.3d at 643; *Norfolk S. Ry. Co.*,
608 F.3d at 160; *City of Auburn v. U.S. Gov't*, 154 F.3d 1025,
1030-31 (9th Cir. 1998).  Here, as in *Green Mountain*, the pre-

construction permit requirement allows the Town to "restrain[]
[the Railway] from development until a permit is issued."  404
F.3d at 643.  Moreover, there is no indication that the
requirements for the pre-construction permit are "set forth in
any schedule or regulation that the [Railway] can consult in
order to assure compliance; and the issuance of the permit
awaits and depends upon the discretionary rulings of
a . . . local agency."  *Id.*  For all of those reasons, the
Town's pre-construction permit requirement places an
unreasonable burden on the Railway's development of its planned
intermodal facility.  The ICCTA therefore preempts the Town's
pre-construction permit requirement as it applies to the
Railway's project.

With respect to the other broad categories of regulation
that the Town wishes to impose upon the Railway, the Court is
not in a position to make a ruling on whether the ICCTA preempts
those types of regulation at this time.  In its post-hearing
memorandum, the Town has argued that the ICCTA does not preempt
its regulation of the following:

the traffic impacts of the project, including the
number of truck trips per day to and from the
facility; the hours of operation with respect to those
truck trips; the routes of those trucks; the location
of the bike path on the property; installation of
adequate pedestrian and bicycle crossings surrounding
the entrance to Route 7; noise levels emanating from
the property; storage of hazardous materials on site;
impacts on wetlands and other ecologically significant

> features, including the maintenance of buffer zones,
> and the protection of public water ways and water
> sources.

ECF No. 77 at 37.  The Town has not identified exactly *how* it intends to regulate those activities, however, stating that it will not be able to do so until the "full scope of the project is clearly defined."  ECF No. 77 at 21.  The Court agrees that the Town cannot determine whether or how its municipal regulations may apply to the Railway's proposed project without knowledge of the project's final plans.  Because the Railway's plans for development have evolved significantly since the project's inception, thereby preventing the Town from articulating how it intends to exercise its police powers, the Court reserves judgment on the question of whether the ICCTA preempts the Town's regulation of the aforementioned activities.[6] When the Railway has finalized its plans for development, and when the Town has indicated precisely which zoning regulations it intends to enforce, the Court will make individual determinations as to whether those regulations "(1) discriminate against rail carriers or (2) unreasonably burden rail carriage." *Norfolk S. Ry. Co.*, 608 F.3d at 160.  Any regulation that is

---

[6] To be clear, the ICCTA preempts the regulation of all activities, including those listed above, to the extent that their regulation precludes the Railway from constructing its proposed intermodal facility.  The Court reserves judgment on the question of whether the ICCTA preempts the Town's regulations as applied to the facility's operation.

discriminatory against the Railway or unreasonably burdensome on rail carriage will be preempted by the ICCTA.

As an example, the Town asserts that it is permitted to regulate "the number of truck trips per day to and from the facility; the hours of operation with respect to those truck trips; [and] the routes of those trucks." ECF No. 77 at 37. The Railway disputes the Town's contention, arguing that such broad regulation of truck traffic is preempted by the ICCTA as "an obviously unreasonable interference with interstate commerce." ECF No. 78 at 7. The Court cannot rule on that question in the abstract. Once the Railway has produced a final site plan, and once the Town has indicated which regulations it intends to enforce, the Court will determine whether the ICCTA preempts such regulations. In so doing, the Court will consider whether the Town's regulations (1) discriminate against the Railway; or (2) unreasonably burden rail carriage. *See Norfolk S. Ry. Co.*, 608 F.3d at 160. The ICCTA will preempt any regulation that is either discriminatory or unreasonably burdensome.

To summarize, the Court enters a **declaratory order** that the ICCTA preempts the Town's pre-construction permit requirement. The Town is therefore **enjoined** from enforcing any regulation that prevents the Railway from constructing its proposed facility. Because the Town cannot prohibit the Railway from

building the intermodal facility, and because the Town has yet
to identify with specificity any operational regulations that it
seeks to enforce, the Town has failed to demonstrate a
likelihood of success on the merits.  For that reason, coupled
with the Town's failure to show a likelihood of irreparable harm
in the absence of injunctive relief, the Court **denies** the Town's
motion for preliminary injunction.

## II.  The Railway's Motion for Judgment on the Pleadings

The Court next turns to the Railway's motion for judgment
on the pleadings.  In deciding a motion for judgment on the
pleadings pursuant to Federal Rule of Civil Procedure 12(c), the
Court employs the same standard applicable to motions to dismiss
under Rule 12(b)(6).  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d
Cir. 2010).  Thus, in order to survive a Rule 12(c) motion, a
pleading "must contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its face."
*Id*. (internal quotation omitted).  A claim is facially plausible
"when [a party] pleads factual content that allows the court to
draw the reasonable inference that the [opposing party] is
liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009) (citing *Bell Atl. Corp. v. Twombley*, 550 U.S.
544, 556 (2007)).

As the Second Circuit recently reiterated, "[a] motion
brought under Rule 12(b)(6) challenges only the 'legal

feasibility' of a complaint." *Goel v. Bunge, Ltd.*, No. 15-3023-CV, 2016 WL 1696597, at *2 (2d Cir. Apr. 28, 2016) (internal citation omitted).  Accordingly, "a court adjudicating such a motion may review only a narrow universe of materials." *Id.* Generally, courts may consider the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Id.* (internal quotation omitted).  In addition, courts may review documents that are "integral to the complaint." *Id.* "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." *Id.* (internal quotation omitted).

**A. The Town's Counterclaim for Public Nuisance**

The Railway first moves for judgment on the pleadings with respect to the Town's counterclaim for public nuisance.  In its Amended Complaint, incorporated by reference into its counterclaim, the Town alleges as follows:

> 34. Plaintiff repeats and realledges [sic] the allegations contained in paragraphs 1-33 above.
> 35. Within the grant of police powers, municipalities are specifically authorized to "prefer complaint for relief by injunction for the abatement of public nuisances."  24 V.S.A. § 2121.
>
> 36. Municipalities are also authorized to "define what constitutes a public nuisance, and to provide procedures and take action for its abatement or removal as the public health, safety, or welfare may require."  24 V.S.A. § 2291(14).

> 37. Defendant's project, to the best of Plaintiff's
> understanding based upon the plans that have been
> shared with the Town, constitutes a public nuisance
> and should be abated.

Case No. 2:16-cv-20, ECF No. 10-1 at 6.  The Railway submits
that the Town's claim is subject to judgment on the pleadings on
the grounds that it does not include sufficient factual
allegations to establish the elements of public nuisance.

Although the Town properly asserts that municipalities have
the authority to define, abate, and remove public nuisances, it
is well established that municipal action in that regard is
subject to review by the courts. *Vt. Salvage Corp. v. Village
of St. Johnsbury*, 34 A.2d 188, 196 (Vt. 1943) (abrogated on
other grounds).  Indeed, the law in Vermont is clear that in
order "[t]o be considered a public nuisance, an activity must
disrupt the comfort and convenience of the general public by
affecting some general interest." *State v. Howe Cleaners, Inc.*,
9 A.3d 276, 294 (Vt. 2010) (quoting *Napro Dev. Corp. v. Town of
Berlin*, 376 A.2d 342, 346 (Vt. 1977)).

Here, based on only those facts alleged in its pleading,
the Town has failed to state a claim for relief that is
plausible on its face.  As the Railway notes, the Town's
pleading does not identify the general interest at issue, nor
does it explain how the Railway's planned intermodal facility
will disrupt or interfere with that common right.  Rather, the

pleading merely asserts the unsupported legal conclusion that the proposed facility "constitutes a public nuisance and should be abated." Case No. 2:16-cv-20, ECF No. 10-1 at 6. Because legal conclusions alone are insufficient to establish the plausibility of a claim, the Town's counterclaim for public nuisance cannot survive the Railway's motion for judgment on the pleadings. *See Iqbal*, 556 U.S. at 664 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."). Accordingly, Count III of the Town's counterclaims is **dismissed.**[7]

## B. The Town's Counterclaim for Unlawful Interference with Easement Rights

The Railway next moves for judgment on the pleadings with respect to the Town's counterclaim for unlawful interference with easement rights. In its Amended Complaint, the Town sets forth the following:

> 16. On or about January 26, 1971, the Railway conveyed to the Town, by way of a Warranty Deed recorded at the Town of Shelburne Town Clerk's Office on February 11, 1971, at Volume 46 Page 32-33, a parcel of land of

---

[7] In its response to the Railway's motion, the Town appears to concede that its pleading fails to allege the public right at issue and how the intermodal facility will interfere with that right. *See* ECF No. 65 at 3. Nonetheless, the Town attempts to cure that defect by suggesting that it "identified many pubic rights that were interfered with in [its preliminary injunction motion]." *Id.* As noted above, when assessing a motion for judgment on the pleadings, courts are generally limited to the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel*, 2016 WL 1696597, at *2. Even if the Court were to consider the evidence presented in relation to the Town's preliminary injunction motion under the Rule 56(a) standard, however, it would find that the Town failed to establish an interference with a public right as a matter of law for the reasons explained in Section I.A. above.

approximately 23 acres along the LaPlatte River for
the purposes of a greenbelt.

17. This 1971 deed also contained a fifteen (15) foot
right of way across contiguous land of the Railway to
access the 23 acre parcel.  The location of that right
of way was to be decided upon by the Railway and the
Town.

18. On or about February 9, 1995, the Northern Vermont
Financial Corporation (successor in title to the
Railway) conveyed to the Town a second easement for
the purposes of a recreation path (hereinafter "Rec
Easement").  A corrective easement was issued on April
26, 1995, and recorded at the Shelburne Town Clerk's
office at Volume 183, Pages 367-370 on May 2, 1995.

19. The Rec Easement contained language that the
Grantor would not place "structures, landscaping or
other improvements within said easement and right-of-
way which shall prevent or interfere with the within
Grantee's ability to use said easement and right-of-
way . . . . In the event Grantor's planned use would
interfere or cause an unsafe condition with respect to
Grantee's use, the Grantor and Grantee shall work
together to move, adjust, and change the easement or
construction to mitigate the problem to a mutually
acceptable level.  Expense of such mitigation shall be
borne solely by the Grantor."

Case No. 2:16-cv-20, ECF No. 10-1 at 3-4.  The Town proceeds to

allege that the Railway's planned development unlawfully

interferes with its above-stated easement rights.  *Id.* at 7.

In its motion for judgment on the pleadings, the Railway

notes that the easement rights at issue are subject to an

arbitration clause.  Specifically, the clause provides that

"[i]n the event of a dispute, each party shall nominate an

arbitrator to settle the dispute; in the event of a disagreement

of said nominated arbitrators they shall nominate a third

arbitrator, whose findings shall be binding upon the Grantor and

Grantee." ECF No. 36-1 at 2. The Town does not contest that
the easement dispute falls within the scope of the arbitration
clause. *See* ECF No. 65 at 5-6. The Town does assert, however,
that in order to invoke the arbitration clause, the Railway must
file a motion to compel arbitration. *Id.* The Town's assertion
is incorrect. As the Second Circuit made clear in *Wabtec Corp.
v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 140 (2d Cir. 2015),
a claim may be dismissed pursuant to Rule 12(b) based on a
mandatory arbitration agreement. Thus, because the parties
agree that their easement dispute is subject to mandatory
arbitration, the Court grants the Railway's motion for judgment
on the pleadings. *See Nicosia v. Amazon.com, Inc.*, 84 F. Supp.
3d 142, 154 (E.D.N.Y. 2015) (granting motion to dismiss pursuant
to a mandatory arbitration clause). Accordingly, Count IV of
the Town's counterclaims is **dismissed.**

### C. The Town's Counterclaim for Breach of Lease

Finally, the Railway moves for judgment on the pleadings
with respect to the Town's counterclaim for breach of lease.
The Town's claim for breach of lease is based on the lease
agreement between the Railway and the State of Vermont in which
the Railway agrees to "maintain and operate said line or lines
of railroad in compliance with Federal, State and Local laws."
ECF No. 6-1 at 5. The Town submits that the Railway has
breached the lease by "not submitting to applying for local and

36

state land use permitting prior to commencing construction" on the intermodal facility.  ECF No. 6 at 13.

As explained above, the Town is not a party to the lease agreement at issue, and the Town has presented no evidence to suggest that it is an intended third-party beneficiary. Consequently, the Town has no right to enforce the agreement between the Railway and the State of Vermont.  *Bischoff v. Bletz*, 949 A.2d 420, 425-26 (Vt. 2008).  The Court therefore grants the Railway's motion for judgment on the pleadings, and Count V of the Town's counterclaims is **dismissed.**

## CONCLUSION

For the reasons set forth above, the Court **denies** the Town's motion for preliminary injunction (ECF Nos. 8 & 13) and **grants** the Railway's motion for judgment on the pleadings with respect to Counts III-V of the Town's counterclaims (ECF No. 36).  In addition, the Court enters a **declaratory order** that the ICCTA preempts the Town's pre-construction permit requirement, and **enjoins** the Town from enforcing any regulation that prevents the Railway from constructing its proposed facility.  The Court therefore **grants in part** the Railway's request for a declaratory judgment that the ICCTA preempts the Town's zoning regulations as applied to the Railway's planned development (Count I of the Railway's Complaint); **denies** the Town's request for a declaratory judgment that the ICCTA's preemption clause does not

37

cover the Railway's planned development (Count I of the Town's counterclaims); and **denies in part** the Town's request for declaratory relief providing that the Railway's project must comport with all zoning regulations arising from the Town's police powers (Count II of the Town's counterclaims).  Counts I, III, IV, and V of the Town's counterclaims are **dismissed**.

The Court reserves judgment on the question of whether the ICCTA preempts other zoning regulations derived from the Town's police powers that relate to the operation of the Railway's proposed facility.  When the Railway has finalized its plans for development, and when the Town has indicated precisely which zoning regulations it intends to enforce, the Court will determine whether those regulations can survive ICCTA preemption pursuant to the police power exception outlined above.

Dated at Burlington, in the District of Vermont, this 29th day of June, 2016.

<u>/s/ William K. Sessions III</u>
William K. Sessions III
District Court Judge