# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

VERMONT RAILWAY, INC., )
                 )
         Plaintiff, )
                 )
         v. )    Case No.: 2:16-cv-16
                 )
TOWN OF SHELBURNE, )
                 )
         Defendant. )

## OPINION AND ORDER

This case arises out of Plaintiff Vermont Railway's ("Railway") development of property located in Shelburne, Vermont for use as a salt transloading facility ("transloading facility" or "facility"). Currently before the Court is the Railway's Motion for Preliminary Injunction (ECF 209), which has been converted to a request for a permanent injunction. Among other things, the Railway now seeks an order permanently enjoining Defendant Town of Shelburne ("Town") from enforcing its recently enacted Ordinance Regulating the Storage, Handling and Distribution of Hazardous Substances ("Storage Ordinance").

The Town passed the Storage Ordinance along with an Ordinance to Regulate Motor Trucks on Town Highways ("Trucking Ordinance") on August 8, 2017.[1] The Trucking Ordinance was passed with an immediate effective date, and the Storage Ordinance had

---

[1] The Storage Ordinance was subsequently amended on October 24, 2017.

an effective date of October 7, 2017. On August 9, 2017, the Town stated in a court filing that it would enforce these new ordinances as well as the Town's Zoning Bylaws[2] and Subdivision Regulations against the Railway. ECF 199.

Among other actions, the Storage Ordinance allows the Town to impose daily fines on the Railway for violations of its salt storage and release restrictions, to issue "health orders" directing the Railway to remove the road salt, and to limit the amount of fuel and other commodities the Railway can temporarily store. The Court previously found that the facility would be used primarily for unloading bulk salt arriving by rail for local distribution by truck and for temporary storage in sheds pending distribution. ECF 84, p. 19. These regulations would impose severe restrictions on the Railway's ability to conduct its business.

The Court began a preliminary injunction hearing on September 25, 2017, but ultimately postponed the hearing and entered a Temporary Restraining Order ("TRO") preventing the Town from enforcing the Storage Ordinance during the intervening

---

[2] The Town's Performance Standards are part of its Zoning Bylaws.

time.[3] ECF 224. The Court held a two-day permanent injunction Hearing on November 1-2, 2017.

After considering the evidence and testimony presented at the hearing, as well as the post-hearing memoranda, the Court concludes that **the Storage Ordinance is preempted** by the Interstate Commerce Commission Termination Act ("ICCTA"). The Storage Ordinance does not fit within the police power exception to preemption, as detailed in *Green Mountain R.R. Corp. v. Vt.*, 404 F.3d 638, 643 (2d Cir. 2005) and *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010), because (1) it discriminates against the Railway and (2) the significant burden it places on the Railway outweighs the Town's inconclusive and overstated public health and safety concerns. The Railway has satisfied the requirements for a permanent injunction because it has suffered an irreparable injury, remedies such as monetary damages will not suffice, the balance of the hardships tilts in its favor, and the public interest is not disserved by a permanent injunction. *See eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Thus, the Court **permanently enjoins** the

---

[3] The TRO went into effect on October 6, 2017 and lasted for 14 days. ECF 224. The TRO did not need to be extended because the Town agreed that it would not seek to enforce the Storage Ordinance until the Court issued its order following the permanent injunction hearing. ECF 243.

enforcement of the Storage Ordinance against the Railway and its facilities.

In the summer of 2016, the Court ordered the Town to identify precisely the regulations it intended to enforce against the transloading facility. ECF 84. Over a year later, the Town identified 21 pages of its Zoning Bylaws and Subdivision Regulations that it is seeking to enforce.[4] ECF 199. For many of these provisions, it is impossible for the Court to conduct preemption and injunction analyses since it is not clear precisely which regulations the Town is seeking to enforce or which regulations the transloading facility is violating. Therefore, the Court is generally not going to address the Zoning Bylaws and Subdivision Regulations. However, these 21 pages the Town submitted to the Court include a section of the Zoning Bylaws entitled "Performance Standards," and §§ 1950.1 and 1950.2(A) under that heading have a very similar focus to that of the Storage Ordinance. *See* ECF 199, Ex. 6, p. 8. Thus, because §§ 1950.1 and 1950.2(A) of the Performance Standards are

---

[4] The focus of the current dispute has largely been on the Storage Ordinance, and the Town seems to have simply attached numerous provisions of its Bylaws as an afterthought. *See* ECF 199. Further, the Court has already found some of these regulations—specifically the ones concerning pre-construction review—to be preempted. The Zoning Bylaws and Subdivision Regulations have been virtually ignored by the parties in their briefing.

so similar to the Storage Ordinance, these two sections are **preempted and permanently enjoined.**

BACKGROUND

On June 29, 2016, the Court granted the Railway's request for a declaratory judgment that the ICCTA preempts the Town's pre-construction zoning regulations as applied to the facility.[5] ECF 84. The Court held that "the construction and operation of the Railway's planned intermodal facility constitute 'transportation by [a] rail carrier[]' as defined by the ICCTA."[6] *Id*. at 25. The Court denied the Town's request for contrary declaratory relief and a preliminary injunction. On September 17, 2016, the Town moved the Court for a temporary restraining order, for relief from this Court's June 29, 2016 Opinion and Order, for a stay of its appeal of that order, and for expedited discovery and a hearing. ECF 90. The Court held a five-day evidentiary hearing on the Town's motions on March 27-29 and April 3 and 5, 2017. On June 28, 2017, the Court issued an Opinion and Order denying the Town's motions and reaffirming its finding that the activity on the Shelburne property constitutes

---

[5] The Court reserved judgment on the question of whether the ICCTA preempts other, unspecified local regulations relating to the operation of the Railway's facility.

[6] The Town appealed this Order, but later withdrew the appeal. *See Vermont Ry., Inc. v. Town of Shelburne*, No. 16-2648, 2017 U.S. App. LEXIS 14646 (2d Cir. Jan. 26, 2017).

transportation by a rail carrier and is thus subject to preemption under the ICCTA. ECF 191.

In its June 29, 2016 order, the Court stated that "[w]hen the Railway has finalized its plans for development, and when the Town has indicated precisely which zoning regulations it intends to enforce, the Court will determine whether those regulations can survive ICCTA preemption pursuant to the police power exception." ECF 84, p. 3. The Railway produced copies of the final plan for development (ECF 85) on July 22, 2016, and requested that the Town identify which police powers, if any, it intended to enforce against the project. The Railway then constructed the first of the two planned salt storage sheds at the facility and began operations in late fall 2016. The Railway completed construction of the second salt shed in June 2017.

After the Town failed to specify the ordinances it intended to enforce for over a year, the Railway filed a Motion to Enforce on July 24, 2017 requesting an order that the Town comply with the Court's June 29, 2016 Order. ECF 196. The Town requested an extension of time to file its response until August 9, 2017, the day after the Town Selectboard's next meeting. ECF 197. At the August 8, 2017 meeting, the Town Selectboard enacted the Storage Ordinance that is the subject of the present Motion for Preliminary Injunction. On August 9, 2017, the Town filed its Response to the Railway's Motion to Enforce and stated that

it would enforce the Storage Ordinance, the Trucking Ordinance, and provisions contained in the Town of Shelburne Zoning Bylaws and Subdivision Regulations with respect to the Railway's facility. ECF 199. The Town identified the Storage Ordinance as falling under the post-construction police powers it intends to enforce against the Railway, as requested by the Court's June 29, 2016 Order.

The Railway filed a Reply to the Town's Response on August 11, 2017, arguing that "[w]ith respect to the Zoning Bylaws and the Ordinance Regulating Motor Trucks on Town Highways, the Town has failed to comply with the Court's Order by indicating 'precisely' the regulations it intends to enforce." ECF 200. The Railway requested an order requiring the town to identify the provisions in these regulations it intends to enforce. *Id*. The Railway also argued that the Storage Ordinance is preempted and noted that it would be challenged in a separate filing (the present Motion for Preliminary Injunction). *Id*.

On August 21, 2017, the Court entered Final Judgment on the June 29, 2016 Declaratory Order. ECF 204. The Court stated that "[i]n accordance with that Order dated June 29, 2016 (ECF 84), and the Opinion and Order dated June 28, 2017 (ECF 191), the Interstate Commerce Commission Termination Act of 1995 ("ICCTA") preempts the Town of Shelburne's pre-construction permit requirement and related zoning regulations as to the Shelburne

transload facility." *Id*. The Town did not appeal Final Judgment and the deadline to do so has now passed.

The Railway filed the present Motion for Preliminary Injunction on September 1, 2017. ECF 209. The Town responded to the Motion on September 18, 2017. ECF 216. At the beginning of the September 25, 2017 preliminary injunction hearing, it was apparent that the parties were not ready to proceed, and the Court decided to postpone the hearing. After the parties conducted discovery, the hearing was converted to a permanent injunction hearing, which was held on November 1-2, 2017.

## THE STORAGE ORDINANCE

Pursuant to its municipal charter, as codified in 24A V.S.A. § 147, the Town adopted the Storage Ordinance on August 8, 2017, with an effective date of October 7, 2017. The Town subsequently enacted an amended Storage Ordinance on October 24, 2017 with an immediate effective date. Storage Ordinance § 15.0. The Storage Ordinance states that it is being adopted by the Town "pursuant to its police powers," with the aim of "protecting the health, safety and welfare of its citizens from the inherent risks associated with the storage, handling and distribution of hazardous substances, which may be ignitable, corrosive, reactive and/or toxic." *Id*. § 1.0.

The Storage Ordinance sets quantity, duration, and location restrictions as to the storage of certain substances. A

substance is deemed to be stored when it is located on a site or in a facility for more than seventy-two hours.[7] *Id*. § 5.0 The Storage Ordinance prohibits the storage of substances above specified quantities within 250 meters of any school or waterway.[8] *Id*. § 6.0. Those specified quantities are: <u>550</u> tons[9] of Sodium Chloride (road salt), Calcium Chloride, Magnesium Chloride, or Potassium Chloride; <u>2,000</u> gallons[10] of Hydraulic Oil, Diesel Fuel, Unleaded Fuel, Heating Oil, Propane, Motor Oil, Natural Gas, or Petroleum Crude Oil; and <u>34,500</u> gallons[11] of Ammonia, Chlorine, or Hydrogen Fluoride. *Id*. Table 1: Storage Limitations.

The Storage Ordinance also prohibits the release or discharge of the substances listed above within the Town of

---

[7] The plan for the transloading facility is to store road salt for months at a time (until it is needed in the winter).

[8] The transloading facility is located within 250 meters of the LaPlatte River.

[9] The Railway's facility holds 80,000 tons. Notably, the capacity of the Town's salt shed is 550 tons. *See* Tr. 254:3-12.

[10] A locomotive fuel tank can hold as much as 3,000 gallons of diesel fuel. *See* Tr. 69:22-70:5. The Storage Ordinance exempts the contents of fuel tanks where that tank is used for actively operating the railcars.

[11] 34,500 gallons happens to be the exact volume that a rail tank car holds. *See* Tr. 78:2-17.

Shelburne (except for specified purposes such as road and driveway de-icing).[12] *Id*. § 5.0, 6.0.

The Storage Ordinance permits the inspection of facilities[13] by either the Town's Health Officer or other designated official in order to enforce the provisions of the Ordinance. *Id*. § 9.0. It institutes a process whereby the Town Health Officer and the Town Selectboard can issue "Health Orders" to require non-complying sites to come into compliance and/or take action to remove the non-complying substance. *Id*. The Storage Ordinance also institutes a fine of $800.00 per day for violation of the ordinance, with each day of the violation constituting a separate offense. *Id*. § 10.0. If the local Board of Health brings an action in Superior Court for a violation, the Storage Ordinance states that the violator may be subject to civil penalties not to exceed $10,000.00 per violation, with each day constituting a separate violation. *Id*. Finally, the Storage Ordinance notes that these penalties may be in addition to any costs and fees incurred by the town to "conduct the removal, remediation or monitoring of the site itself." *Id*.

---

[12] This would likely cover any spillage of road salt that occurs in the transloading process.

[13] "Facility" is defined to include buildings, structures, rail cars, and "[a]ny site or area where a hazardous substance is present on site, has been deposited, is stored, disposed of, placed or otherwise is located." *Id*. § 5.0.

## THE TRANSLOADING FACILITY

The Railway has undergone an extensive permitting process for its transloading facility through the State of Vermont and has implemented a sophisticated environmental monitoring and mitigation plan. The Railway hired a professional environmental consultant, Mr. Jeffrey Nelson of VHB, to oversee its Multi-Sector General Permit ("MSGP") application. As mandated by the MSGP, the Railway prepared a Storm Water Pollution Prevention Plan ("SWPPP") and applied for an authorization to discharge from the Vermont Department of Environmental Conservation ("DEC"). The Town was invited to, and did, participate in the SWPPP process. The DEC, in consultation with the Vermont Department of Fish and Wildlife and other State agencies, considered the plan for the facility and its potential impact on water quality, wetlands, and endangered species. Following this review, the DEC approved the SWPPP and issued an authorization to discharge on November 21, 2016.[14] *See* Railway Ex. 30. An annual report must be filed with the DEC disclosing any SWPPP compliance issues as well as any corrective action taken. *See* Railway Ex. 30.

The SWPPP mandates groundwater and surface water monitoring as well as adherence to numerous environmentally-focused best

---

[14] Notably, the Town did not appeal this authorization.

management practices ("BMPs"). Importantly, compliance with the SWPPP is required by the DEC. *See* Tr. 523:12-25; Railway Ex. 30 § 4; Vermont SWPPP Instruction Booklet, p. 18;[15] Vermont SWPPP Template, p. 20 and Appendix F.[16] Several monitoring wells were installed around the transloading facility as well as in the LaPlatte River. *See* Railway Ex. 29 and 31.

VHB is monitoring the LaPlatte River both upstream and downstream of the facility, and the measurements have shown no impact from the facility downstream in the river. *See* Tr. 176:16-19. Increased levels of sodium chloride were recently detected in Monitoring Wells 301 and 306 on the facility site itself. Mr. Nelson and other VHB employees immediately investigated the cause of this increase. *See* TR. 155:14-16; 166:12-25. They concluded that salt had spilled during the transloading process[17] and a problem with the pitch of the pavement in one area of the facility had caused some stormwater to flow into the wetland (where these monitoring wells are

---

[15] Available at:
http://dec.vermont.gov/sites/dec/files/wsm/stormwater/docs/Multi SectorGeneralPermit/sw_SWPPP_instruction_booklet.pdf.

[16] Available at:
http://dec.vermont.gov/sites/dec/files/wsm/stormwater/docs/Multi SectorGeneralPermit/sw_fillinable_SWPPP.doc.

[17] These increases were not related to the actual storage of salt in the sheds. Tr. 168:10-20. Notably, there were not significantly elevated readings at the various other parts the property (i.e. near the storage sheds). Tr. 155:10-12.

located) instead of into the stormwater basin. VHB and the Railway quickly worked to correct the problem. Tr. 156:12-159:11. This example demonstrated how the SWPPP functions—the monitoring requirements caught the problem and prompted corrective action.

**DISCUSSION**

**I.  PREEMPTION**

**A.  Legal Standard**

In its June 29, 2016 Order, the Court discussed at length the Supremacy Clause of the United States Constitution, the history of the ICCTA, and the limited police powers local bodies retain to protect public health and safety. ECF 84. A brief recapitulation of that discussion is warranted here in order to assess the validity of the Storage Ordinance.

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Accordingly, "[u]nder the doctrine of preemption, a corollary to the Supremacy Clause, any state or municipal law that is inconsistent with federal law is without effect." *Greater New York Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 104-05 (2d Cir. 1999) (abrogated on other grounds). "Federal law may preempt state and municipal law expressly or impliedly," *id*. at

105, and express preemption occurs "when a federal statute
expressly directs that state law be ousted," *Island Park, LLC v.
CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009) (internal quotation
omitted). In the present case, the statute at issue is the
ICCTA.

The ICCTA vested the Surface Transportation Board ("STB")
"with broad jurisdiction over 'transportation by rail
carriers.'" *Id*. (quoting 49 U.S.C. § 10501(b)(1)). The ICCTA
gave the STB exclusive jurisdiction over "(1) transportation by
rail carriers . . . and (2) the construction, acquisition,
operation, or discontinuance of . . . tracks, or facilities." 49
U.S.C. § 10501(b). The ICCTA defines "transportation" to
include:

> (A)  a locomotive, car, vehicle, vessel, warehouse,
> wharf, pier, dock, yard, property, facility,
> instrumentality, or equipment of any kind related to
> the movement of passengers or property, or both, by
> rail, regardless of ownership or an agreement
> concerning use; and
> (B)  services related to that movement, including
> receipt, delivery, elevation, transfer in transit,
> refrigeration, icing, ventilation, storage, handling,
> and interchange of passengers and property.

49 U.S.C. § 10102(9). It defines "rail carrier," in relevant
part, as "a person providing common carrier railroad
transportation for compensation." 49 U.S.C. § 10102(5). In its
June 29, 2016 and June 28, 2017 orders, the Court found that the
activity at the Railway's facility constitutes transportation by

14

a rail carrier for purposes of 49 U.S.C. § 10501. ECF 84; ECF 191.

In addition to the above-cited jurisdiction provision, the ICCTA contains an express preemption clause. Specifically, the statute indicates that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). Interpreting that clause, the Second Circuit has held that the "ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Island Park, LLC*, 559 F.3d at 102 (internal quotations omitted).

Because the Court has already determined that the activities conducted at the facility constitute transportation by a rail carrier and are thus subject to the ICCTA's preemption clause, the Court now needs only to determine whether the Storage Ordinance falls within the scope of ICCTA preemption. *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (hereinafter "*N.Y. Susquehanna*"). As noted above, the plain language of the ICCTA grants the STB broad authority to regulate the railway industry. Nonetheless, it is well established that "not all state and local regulations are

preempted [by the ICCTA]; local bodies retain certain police powers which protect public health and safety." *Green Mountain* 404 F.3d at 643. In order for a state or local regulation to escape ICCTA preemption under the police power exception, the regulation "must not (1) discriminate against rail carriers or (2) unreasonably burden rail carriage." *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010) (citing *N.Y. Susquehanna*, 500 F.3d at 254 (citing *Green Mountain*, 404 F.3d at 643)). The Second Circuit has further explained that state and local regulations are not preempted "at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions." *Green Mountain*, 404 F.3d at 643.

## B. The Storage Ordinance is Preempted

The Storage Ordinance enacted by the Town does not meet the requirements of the police power exception to ICCTA preemption. First, the timing of its enactment, the focus and thresholds included in it, and the severe penalties permitted by it all point toward discrimination against the Railway. Second, the Storage Ordinance would place significant restrictions on when and where rail cars move and when and where rail commodities are shipped and stored. These restrictions as applied to the

facility unreasonably burden rail transportation and do not meaningfully protect public health and safety. Thus, the Storage Ordinance is not a valid use of the Town's police powers and is preempted by the ICCTA with respect to the Railway's facility.

### 1. Discrimination

The Storage Ordinance was enacted one day before the Town submitted its Response to the Railway's Motion to Enforce the Court's June 26, 2016 Order. The Town argues that an ordinance of this nature has been contemplated by the Town for several years, long preceding the Railway's transloading facility. While it may be true that the Town has considered regulating hazardous materials generally in the past, the timing of the Storage Ordinance's enactment in the context of the present case is indicative of a desire to specifically target the Railway's facility. Similarly, the focus of the Ordinance on salt storage and the threshold limits point towards discrimination. The Storage Ordinance permits storage of up to 550 tons of salt, which allows the Town's salt shed to continue to operate despite the fact that it is located adjacent to a school and the LaPlatte River. As there are only two salt storage facilities in Shelburne (the Town's salt shed and the Railway's facility), the Railway points out that its facility is the only facility to which the salt storage provisions of the Storage Ordinance would apply. Similarly, provisions of the Storage Ordinance restrict

the temporary storage of commodities such as fuel transported by the Railway but exempt from its regulations existing gas stations and "heating oil [], propane or natural gas, if held in a storage tank on a residential, institutional, governmental or commercial property strictly for the home, business or property owner's residential or commercial [] needs." Storage Ordinance § 6.0. The Storage Ordinance also permits the release/discharge of road salt into the environment relating to road and driveway de-icing purposes but likely prohibits it relating to the facility's transloading process. *Id*. § 5.0; 6.0. Based on the focus, thresholds, and practical impact, these provisions clearly target and discriminate against the Railway's facility.

The testimony of several Town Selectboard members at the permanent injunction hearing supports a finding that the Storage Ordinance was enacted as a result of this litigation and in an effort to discriminate against the Railway. While evidence was presented that the Town had concerns about hazardous materials in general for several years, there was no discussion of problems created by the storage of road salt, nor the drafting or enacting of the Storage Ordinance, until after the Court's ruling on June 28, 2017. Selectboard members Dr. Colleen Parker, Dr. Josh Dein, and former Selectboard Vice Chair John Kerr testified that that they first heard of the drafting of the Storage Ordinance in either July or August of 2017. *See* Tr.

505:7-12; 280:12-15; 295:23-296:5. Selectboard Chairman Gary von Stange stated that: "Certainly this litigation has impacted the passage of the [Storage] ordinance, but the passage of the [Storage] ordinance followed the same exact path of every other ordinance and it was targeted towards the substance just like every other ordinance we've passed." (Tr. 516:4-9).

In response to public concern about provisions in the Storage Ordinance enacted on August 8, 2017, the Town made several changes and enacted an amended Storage Ordinance on October 24, 2017. Fuel tank limits were increased, Town residents are now clearly permitted to spread road salt on their driveways, and clarifications were made with respect to the impact on existing gas stations. Tr. 63:1-12. Notably, while many other interested parties' concerns about the Storage Ordinance were resolved, the Railway's concerns were not meaningfully addressed. The 550 ton sodium chloride storage limit was not increased. The storage time limit was increased from twenty-four hours to seventy-two hours, but this does not meaningfully help the Railway, as the plan for the facility is to store salt until it is needed by customers during the winter months.

The Town's contention that the Storage Ordinance is one of general applicability may be a matter of some dispute. Nonetheless, the timing of its enactment with respect to this

litigation, as well as the fact that its road salt restrictions essentially only apply to the Railway's facility, clearly show discrimination.

### 2.  Unreasonable Burden

The Storage Ordinance would have a severe impact on the Railway's operations at the facility. This impact needs to be balanced against the Town's interest in protecting public health and safety.

### i.  Impact on the Railway

The Storage Ordinance would impose a seventy-two hour limit on the storage of salt and other materials at the facility. Storage Ordinance § 5.0. The Railway's operational plan is to load salt into storage sheds at the facility during the summer months when it is more efficient, and to have the salt ready when needed during the winter months. Putting a seventy-two hour time restriction on storage at the facility is not feasible. Both before and during the winter, customers throughout Vermont— such as the Town itself—will receive shipments of salt from the facility as needed to replenish their salt sheds. This logistical plan would be significantly impeded by a requirement that the salt leave the facility within seventy-two hours of its arrival.

Furthermore, the Storage Ordinance would limit the quantity of salt stored at the facility to 550 tons. *Id*. § 6.0, Table 1.

The Railway's facility is designed to store 80,000 tons of salt. Without this storage capacity, there is no way to satisfy customer demand. Additionally, without this capacity, the Railway will be in breach of its contract with Cargill (the owner of the road salt). The Storage Ordinance would also regulate the contents of rail cars on tracks and sidings in Shelburne. *Id*. § 5.0. These tracks and sidings are already subject to extensive federal regulations. Finally, the Storage Ordinance prohibits the "release of [salt] into the environment." *Id*. § 5.0; *see also* §6.0(B). The term "release" is potentially vague enough to permit the Town to take enforcement action in response to the unloading of salt at the facility.

The Town suggests that the Railway could simply build a new transloading facility in another town despite the fact that the existing transloading facility purportedly cost $5.5 million to build and is in a strategic location. The Town has offered Mr. Gary Hunter, a railroad operations expert, who opined that operations at the facility could be halted and moved to another town, such as Ferrisburgh, Vermont. Mr. Hunter also stated that the Railway could comply with the seventy-two hour storage limitation by immediately shipping the salt to other sites. Neither of these suggestions are remotely feasible. If the facility were located in Ferrisburgh, the trucks transporting the road salt would need to drive the entire length of the Town

of Shelburne to reach the interstate, which would likely have a greater impact on public welfare as compared to the current location (which minimizes truck traffic through the Town). Also, the whole point of the facility is for it to be gradually filled during the summer months and then unloaded when the salt is needed during the winter months. Mr. Hunter's suggestion about compliance with the seventy-two hour time limit is not realistic. In listening to Mr. Hunter's testimony, it was apparent that he lacked familiarity with the particularities and needs of the Vermont region, the Town, and the Railway.

## ii. Public Health and Safety Concerns

A significant portion of the testimony at the permanent injunction hearing focused on whether the Storage Ordinance actually promotes public health and safety and whether the facility is actually a danger. After a thorough review process, the Vermont Department of Environmental Conservation specifically permitted the activities that are occurring at the transloading facility. The DEC is also overseeing compliance with the SWPPP's monitoring requirements. The Court is not convinced that the Town had a reasonable basis for classifying road salt as a hazardous substance that is harmful to public health and safety and attempting to regulate it as such. The Court is also not convinced that the activities at the Railway's facility that appear to violate the Storage Ordinance are

sufficiently dangerous to public health and safety to escape ICCTA preemption. And the Court is not convinced that monitoring by DEC would be inadequate to protect public health.

First, the Town's experts knew of no other federal or state legislation that classified road salt as a hazardous material aside from that of the Town of Shelburne. *See* Tr. 436:15-20; 386:5-11. Second, the Railway's facility is a brand new, professionally engineered facility with an extensive environmental monitoring system in place. Comparatively, it appears that the only other salt shed in Shelburne (the one owned by the Town that is effectively exempted from the Storage Ordinance) does not have any such environmental monitoring in place. While the Town's expert, Mr. Hunter, focused on the need to protect the "health, safety, and welfare" of the Town's residents, *see, e.g.*, Tr. 458:1-2; 474:13-14; 478:15-16; 478:21-22; 490:18; 491:6-7, those same concerns are some of the primary goals of the facility's SWPPP. Further, the State of Vermont has played an active role in analyzing the public health and safety concerns with the facility. Third, the Town has not put forward any convincing evidence that the storage duration or storage quantities of road salt are dangerous to public health and safety. The Railway's storage of road salt, by definition, keeps the road salt contained. From both a common sense and scientific perspective, it is hard to see how the mere *storage* of road

salt, in any quantity and for any duration, negatively impacts public health. The Town has highlighted various articles demonstrating environmental concerns with the spreading of road salt on roads, but there has been a total dearth of convincing information as to how the storage itself is dangerous.

The Storage Ordinance also prohibits the release or discharge of road salt except for de-icing of roads, driveways, and sidewalks. Storage Ordinance § 5.0. This would likely prohibit any spillage that occurs during the Railway's transloading process. It is unclear why this likely minor spillage would be regulated while the extensive and deliberate release of road salt throughout the town for the de-icing of roads would be exempted. The transloading process is a necessary part of the Vermont region's road salt operations. Further, one questions the Town's sensitivity to the environmental impact of road salt when the Town itself deliberately releases road salt into the environment by spreading it all over the Town's roads throughout the winter in an effort to maintain safe driving conditions.

The mere duration and quantity of road salt that is stored appears to have no impact on the purported health and safety risks. The transloading process and any related spillage is being closely monitored by the SWPPP. The transloading process

is a necessary component of the overall road salt operation, and the Railway is clearly attempting to minimize spillage.

While it is true that the ICCTA does not preempt all local regulations and a police power exception exists, the Storage Ordinance does not fit within the exception. The Court is not convinced that the Storage Ordinance achieves any meaningful health or safety goals that outweigh the significant burden it places on the Railway.

## PERMANENT INJUNCTION

### A.    Legal Standard

A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### B.    Enforcement of the Storage Ordinance against the Railway and its facilities is permanently enjoined

The Railway has satisfied the four-factor test for a permanent injunction as to the Storage Ordinance. *See eBay*, 547 U.S. at 391. First, its injury is irreparable because it cannot divest itself of the 80,000 tons of salt its sheds hold within seventy-two hours. Further, the entire point of the facility is

to store salt until it is needed by customers during the winter—a much greater time period than seventy-two hours. The Railway has spent $5.5 million on the transloading facility and, according to Railway President Mr. David Wulfson, the Railway would potentially go out of business if it attempted to construct a new facility in a different location. This restriction would also put the Railway in breach of its long-term, multi-million-dollar contract with Cargill, the owner of the road salt.

Second, the only adequate remedy for this injury is to enjoin the enforcement of the Storage Ordinance. Monetary damages will not suffice, as it is not feasible for the Railway to operate in constant violation of a Town ordinance. Third, the balance of the hardships tilts in the Railway's favor. The facility is already regulated by the State of Vermont, has received a permit to discharge, and its environmental impact is constantly monitored pursuant to its SWPPP. The burden the Storage Ordinance places on the Railway is very significant, while the Town has failed to establish a sufficient basis for its public health and safety concerns. Finally, the public interest is not disserved by this permanent injunction. In fact, in the absence of this injunction, the public would likely be at much greater risk because of the serious impact the Storage Ordinance would have on this winter's road salt operations.

## C. Performance Standards

In addition to its request for an order permanently enjoining enforcement of the Storage Ordinance, the Railway seeks an order permanently enjoining the Town from enforcing its Performance Standards, which are part of the Town's Zoning Bylaws, against the Railway and its facilities.

The Town has been directed to identify precisely which police power regulations it intends to enforce. ECF 84. The Town has not identified any violations of its Zoning Bylaws or Subdivision Regulations—the Town has merely attached numerous provisions without any mention of how the transloading facility is in violation of any particular provision.[18] ECF 199, Ex. 6. The parties have not focused on these provisions in their briefing.

Given the lack of attention paid to the Zoning Bylaws and Subdivision Regulations, the Court is generally not going to address them. That being said, §§ 1950.1 and 1950.2(A) of the Performance Standards are extremely similar to the Storage Ordinance. Section 1950.1 prohibits the use of any land or building in a manner creating a dangerous, noxious, or otherwise

---

[18] The Court also notes that many of the provisions of the Town's Zoning Bylaws and Subdivision Regulations relate to the pre-construction review process that the Court has already found to be preempted.

objectionable use or hazard. *See* ECF 199, Ex. 6, p. 8. Section 1950.2(A) states that "[a]ll activities involving use, handling or storage of hazardous material shall be provided with adequate safety devices against the hazard of fire and explosion" and that the "[s]torage of flammable liquids, with the exception of propone gas and gasoline/diesel fuel in containers of six gallons or less, in residential areas is prohibited." *Id*. These provisions could be enforced to prohibit the same activities the Town intended to prohibit with the Storage Ordinance, and their enforcement would place the same significant burden on the Railway. Thus, for the same reasons discussed above in Section II.B with respect to the Storage Ordinance, §§ 1950.1 and 1950.2(A) of the Performance Standards are preempted and their enforcement with respect to the transloading facility is permanently enjoined.

### D. Enforcement of all police powers in the future is not enjoined

Finally, the Railway has essentially requested an order from the Court stating that the Town is enjoined from enforcing any and all zoning or subdivision regulations under the Town's police powers ever into the future. The Court appreciates the bitterness of this dispute, but this request is a step too far. Such an order would forever bar the Town's exercise of its police powers even if enacted by subsequent selectboards. While

not issuing such a broad injunction, the Court notes that the Railway would certainly have recourse if it is subjected to frivolous litigation related to its transloading facility in the future.

## CONCLUSION

The storage facilities constructed by Vermont Railway are technologically sophisticated structures designed to minimize leakage of salt into the environment. The facilities are monitored closely through systems reviewed and approved by the Vermont Department of Environmental Conservation. In light of the State's involvement in the storage facilities and efforts by the Railway to minimize environmental impact, the Court is convinced these structures do not pose an irresponsible risk to the health and safety of the community. Shelburne's Storage Ordinance and §§ 1950.1 and 1950.2(A) of its Performance Standards pose unreasonable restrictions on the Railway in its operation of the storage facilities and are preempted under the ICCTA. Enforcement of the Storage Ordinance and §§ 1950.1 and 1950.2(A) of the Town's Performance Standards against the Railway and its facilities is permanently enjoined.

Dated at Burlington, in the District of Vermont, this 7th day of December, 2017.

/s/William K. Sessions III
William K. Sessions III
District Court Judge